## THE PRESIDENT, MANAGERS AND COMPANY OF THE BALTIMORE AND FREDERICKTOWN TURNPIKE COMPANY *vs.* HENRY ROUTZAHN.

*Turnpike Company—Act of* 1804, *ch.* 51—*Toll-gates—Tolls.*

In an action for tolls brought by one of the turnpike companies chartered by the Act of 1804, ch. 51, it was HELD:

1st. That it was not contemplated by said Act that said company should have but one toll-gate for every ten miles of its road, or that they should be located exactly ten miles apart.

2nd. That in view of the object of the grant it was reasonable to suppose that the Legislature intended that the power to determine the number and location of the gates should be a continuing one, to be exercised at any time, and to include the power of removing gates from one place to another.

3rd. That if this question were a doubtful one, then a long established usage in this respect, which has met with the uniform and entire acquiescence of the public, may well be invoked to solve the doubt in favor of the existence of the power.

4th. That the defendant was chargeable with tolls according to the distance between the gates, and not according to the distance on the turnpike actually travelled by him.

APPEAL from the Circuit Court for Frederick County.

The case is stated in the opinion of the Court.

*First Exception.*—Abandoned.

*Second Exception.*—Stated in the opinion of the Court.

*Third Exception.*—The defendant further to maintain the issues on his part joined, asked the witness the question: "Where do you reside?" stating that the object of the question was to show that defendant resides, not within three miles of the toll-gate in evidence mentioned, but within three miles of the place where a gate of defendant originally stood, and whence it was illegally and improperly removed. But the plaintiff objected to the question being asked, for the purpose and object indicated, but the Court (LYNCH and VINCENT, J.,) overruled the objection, and permitted the question to be asked and answered, for the object indicated. The plaintiff excepted.

*Fourth Exception.*—On cross-examination, the defendant offered to show that, in 1851, the toll-gate, whose original location was west of the present site, about one and a half miles, and was used from the time of its original location, upon building and completion of the road, until 1881, was moved to its present location, near Fairview, towards Frederick, by plaintiff; it being admitted that there was no legislative authority therefor, except as the same may be found in the Act of 1804, and other Acts of the Legislature, upon the subject of the plaintiff's road, and that witness is toll-gatherer at said Fairview gate; that the items of toll sued for in this action are those claimed by plaintiff to be due by defendant for passing through said toll-gate at Fairview, so located there in 1851, and that said original gate was abandoned, said evidence being

offered for the purpose of showing that, by the removal of said gate, the plaintiff had no right to collect tolls at its present gate at Fairview. To which evidence as offered, and for the purpose for which it was offered, the plaintiff objected. The Court overruled the objection and permitted the evidence to be given as offered, for the purpose for which it was offered. The plaintiff excepted.

*Fifth Exception.*—The defendant offered the following prayers:

1. That, under the pleadings and evidence, if the jury shall find, from the evidence in the cause, that the plaintiff removed its original toll-gate to a place one and a half miles east of such original location, and near to or at Fairview, and that the items sued for in this action are items of toll charged by the plaintiff against the defendant, on account of defendant passing through such toll-gate, so removed to or near Fairview, (if they shall so find,) that then their verdict must be for the defendant.

2. The defendant further prays the Court to instruct the jury that, if the jury shall find that plaintiff removed its original toll-gate from the place where the same was located upon the completion and construction of its road, to a place one and a half miles further east, and that the items sued for in this action are charges of toll made by plaintiff against defendant, on account of defendant passing through such new or removed gate, (if they shall find such removal,) that then such removal of said gate (if so found) was unlawful, and the plaintiff is not entitled to charge or collect any tolls whatever, from the defendant, at such new or removed gate, and the verdict of the jury must be for the defendant.

The Court granted both prayers. The plaintiff excepted, and the verdict and judgment being rendered against him, appealed.

The cause was argued before MILLER, STONE, ALVEY, and IRVING, J.

*Wm. P. Maulsby, Jr.*, and *I. Nevett Steele*, for the appellant.

*James McSherry*, and *E. Y. Goldsborough*, for the appellee.

MILLER, J., delivered the opinion of the Court.

In this case suit was brought by the Turnpike Company to recover tolls for the use of its road by the appellee. The particular gate at which the tolls accrued was on that part of the road which lies between Frederick and Middletown. The appellee was a mail carrier between those places, using the road daily, and the arrangement was for the gate-keeper to charge the tolls and collect them at the end of each month. He failed, however, to pay any tolls from the 1st of March, 1881, to the 15th of February, 1882, when this action was instituted to recover them.

It appears from the testimony in the record that upon the completion of the road the company erected a gate between Frederick and Middletown, at a point about one and a half miles west of Fairview. In 1851 this gate was removed by the company to Fairview, its present site, which is nearer to Frederick, and has there been maintained and used ever since. When this removal was made, the old gate was discontinued and abandoned. At the trial five exceptions were taken, but the main defence, which the Court below sustained by the granting of the defendant's prayers, was that the removal of the gate, made as above stated, was unlawful, and the company was not entitled to charge or collect any tolls whatever at such new or removed gate.

The question thus raised is one of importance not only to this company, but to all similar companies chartered with the same powers, for it was conceded in argument that all of them have changed the location of their gates

so that scarcely one now occupies its original site. It follows, therefore, that if the position taken by the appellee, and sustained by the Court below, be sound, the power to collect tolls on almost every turnpike in the State will be stricken down, at least until the gates are moved back to the places where they were first located. The determination of the question, however, depends entirely upon the powers vested in the corporation by its charter. In reference generally to such a charter, this Court, in *Douglass vs. Boonsborough Turnpike Road Company*, 22 *Md.*, 237, has said, " It would be contrary to the spirit and intention of the original laws creating public highways not to give them a liberal construction; and though a grant to a private corporation is to be construed strictly, yet it is not to be so construed as to defeat the object of the grant."

The appellant was incorporated by the Act of 1804, ch. 51, for the purpose of "making a turnpike road from the City of Baltimore through New Market, to and through Fredericktown, and from thence to and through Middletown, and from thence to Boonsborough." By the same Act two other companies were also incorporated, one for making the Baltimore and Reisterstown, and the other for making the Baltimore and Yorktown turnpike. And by the 19th section of this law it is provided that as soon as either of these companies shall have perfected either of the roads for any distance from Baltimore not less than ten miles, and so on from time to time any other like distance progressively, they shall give notice thereof to the Governor, who shall thereupon appoint three persons to examine the same and report to him in writing whether the road is so far extended in a masterly workmanlike manner, according to the true intent and meaning of this Act, and if their report shall be in the affirmative, then the Governor shall, by license under his hand and the seal of the State, "permit and suffer the said presidents, managers and companies to erect and fix such and so many

gates or turnpikes upon and across the said road as will be necessary and sufficient to collect the tolls and duties hereinafter granted to the said company, from all persons travelling on the same with horses, cattle, wagons, carts and carriages." Then, by section 20, it is provided that the said respective companies having perfected either of the roads or such parts thereof from time to time as aforesaid, and the same being examined, approved and licensed in manner aforesaid, it shall and may be lawful, for them "to appoint such and so many toll-gatherers as they shall think proper, to collect and receive, of and from all and every person and persons using the said road, the tolls and rates hereinafter mentioned, that is to say, for every space of ten miles in length of the said road, the following sum of money, and so in proportion for any greater or lesser distance." And then follows a schedule of rates. By the Act of 1809, ch. 2, entitled "An Act to confirm the location of the turnpike roads therein mentioned," it was enacted that each of the roads mentioned in the Act of 1804, "as at present located, turnpiked and licensed be, and the same is hereby, confirmed;" and by the supplemental Act of 1811, ch. 202, passed upon the petition of these companies, representing that since the passage of the Act of 1809, "they have completed the whole of the said roads," it was again enacted that these roads "severally and respectively as at present located, turnpiked and licensed be, and the same are hereby, confirmed." It was contended in argument by the appellee's counsel that the term "turnpiked" used in these statutes, refers to the location of gates across the roads, and means the same thing as the term "gated" would mean if used in the same connection. Assuming, for the sake of the argument, that this is so, still it is entitled to very little weight in determining the question of power we are now considering, for the sole effect of these confirmatory Acts, as pointed out in *Peddicord's Case,* 34 *Md.,* 475, was to relieve the roads

from liability to forfeiture, or to revert to the counties under the Act of 1804, ch. 101, sec. 3, because they had not been constructed so as not to rise or fall at a greater angle than four degrees with an horizontal line, as required by the 17th section of the original charter. But from these statutes and the testimony in the record, we infer that the road was completed prior to the year 1811, and that the gate in question was at that time located about one and a half miles west of the site to which it was removed in 1851, and where it has since remained.

Had the company the authority under the proper construction of these nineteenth and twentieth sections of its charter to make this removal? In our opinion this question must be answered in the affirmative. It is obvious that unless this power to collect tolls had been granted these roads would never have been constructed. Prior to the Act of 1804 laws had been passed having in contemplation these works of internal improvements in which the people of the State were deeply interested. But in the preamble to this Act it is recited "that by the several laws heretofore passed on this subject, the desirable object contemplated by the Legislature has not been obtained, and the public expectation has been almost entirely frustrated;" and it was for this reason the companies were incorporated. The right to receive tolls for the use of the roads when constructed was the sole inducement held out to the original subscribers and stockholders to invest their money in the enterprise, and as was to be expected, the grant is made in broad and comprehensive terms. The rate of tolls for every ten miles, and so in proportion for any greater or less distance is carefully prescribed, and power is then given to the company to erect and fix *such and so many* gates as will be necessary and sufficient, and to appoint *such and so many* toll-gatherers as they shall think proper, to collect and receive these tolls. From this it would seem to be very clear that the location, as well as

the number, of the gates is committed entirely to the judgment and discretion of the company, with the limitation that they can collect only the prescribed rate of tolls whether they locate one or more gates within the space of ten miles. That it was not contemplated there should be but one gate for every ten miles, or that they should be located exactly ten miles apart is manifest, not only from the terms "and so *in proportion* for any greater or lesser distance," used in the twentieth section, but from the provision of the thirty-first section, which declares that "at every gate or turnpike by them to be fixed on the said road, the company shall cause the distance from Baltimore, and the distance from the nearest gates or turnpikes in each direction, to be marked in legible characters, designating the number of miles and fractions of a mile on the said gates, or some other conspicuous place for the information of travellers and others using the said road." The number and location of the gates being thus left to the discretion of the company, we find that the power to change their location from time to time is not only not prohibited, but such prohibition seems to have been purposely omitted. The object of the grant was to secure the collection of these tolls so long as the road should exist, and when we look to its character and permanence, and consider the then probable and indeed inevitable increase and change of travel by means of newly opened and connecting roads, it is reasonable to suppose the Legislature intended that the power to determine the number and location of the gates should be a continuing one to be exercised at any time, and to include a power of removal such as was exercised in this case. It is true the terms of the grant are to "erect and fix" the gates, and counsel for the appellee have strenuously contended that such a power, when once exercised is exhausted, and no power, either to erect new gates, or to change the location of old ones any longer exists. This position is undoubtedly countenanced

if not sustained by the two cases in Connecticut to which they have referred: *State vs. Norwalk & Danbury Turn-pike Co.*, 10 *Conn.*, 157 ; *Turnpike Society vs. Hosmer*, 12 *Conn.*, 361. But in our judgment a more reasonable view of the subject has been taken by the Courts of New Hampshire and Vermont in the cases of the *Cheshire Turnpike vs. Stevens*, 10 *N. H.*, 133, and *Fowler vs. Pratt, et al.*, 11 *Verm.*, 369. In the first of these cases the charter gave the company power to erect "so many gates or turnpikes, upon and across said road, as may be necessary to collect the tolls," and it was held that this gave them the power to increase the number of gates originally established, and to change their situation from time to time, provided they were not placed in any position prohibited by the charter. "The object" of the grant, say the Court, "was to give the corporators the means of securing toll for all the travel on their road ; and if the gates first erected were found inadequate for that purpose, they had the right to increase the number until the object was attained. As the means of evading the toll were multiplied the corporation were at liberty to adopt additional measures to secure it. In the outset it must often happen that the necessary number and location of the gates cannot be foreseen; and to preclude the corporation from adopting such measures in future as might be required to secure the profits of the road, to which they were justly entitled, would in some cases prove destructive to its interest. No instance has occurred, since the existence of turnpike roads in this State, where the right of the corporation to increase and locate their gates anew, has been questioned. It has been done in a variety of instances, and we see no reason for interfering, and abridging such corporations of this right." In the other case the charter in one section gave the company power to erect two gates, and in another to erect any additional gate or gates, and to average the toll allowed by the Act to the respective

gates so that no additional toll should be collected, and the question was whether the company having once erected a gate or gates, have a right to remove them, or whether they must be considered as fixed and established however important it may be to the interest of the corporation to change their location. The Court said "there is nothing in their charter which requires that the gates should be thus fixed or prohibits the company from removing them. On the contrary they were authorized to erect any additional gates, averaging the toll and not receiving any additional toll. The power of thus removing gates has uniformly been exercised by many, if not all, the turnpike corporations in this State, and without this power their grants would be rendered in many cases wholly inoperative."

Doubtless the gates on all the roads mentioned in this Act of 1804 were originally located with a view, among other things, to the then existing channels of travel over connecting public county roads, and since that time it may well have happened by closing old and opening new intersecting roads, that these turnpikes could for long distances have been extensively used by those who would have been subjected to no tolls whatever if the location of the gates had not been changed. Without this power of removal the companies would have been, and would now be, subjected to the burden and expense of keeping their roads in repair for the benefit, in a great measure, of those who could use them free of charge, and to the great diminution of the tolls which it was the undoubted purpose of the grant to secure to them. We are clearly of opinion the law-makers never intended such a result, and in our judgment the language of the statute read in connection with the character and object of the grant authorizes the construction we have given it. But if the question were a doubtful one, then what has been conceded to have been the long established usage in this respect, not only of this

but of all other turnpike companies in the State, a usage which has hitherto met with the uniform and entire acquiescence of the public, may well be invoked to solve the doubt in favor of the existence of the power.

But while we thus decide in favor of its existence we are not to be understood as holding that this power of increasing and removing gates is not liable to be and cannot be abused. On the contrary we have no doubt it may be abused, and for such abuse, when it shall occur, a remedy will undoubtedly be found; but we hold that such a removal as this record discloses is clearly a legitimate use of the power.

This construction of the charter dispenses with the expression of any opinion upon the question, whether, conceding the company had no right to remove this gate and to establish a new one, or the old one at a new site, such want of power, or unlawful act, can be set up as a defence to an action for tolls. It also disposes of the questions raised or intended to be raised by the third and fourth as well as the fifth exception. The first was abandoned and the second exception only remains to be considered.

From this exception it appears the defendant, when on cross-examination as a witness, was asked what is the distance from Frederick to Middletown? and to this question so far as it was asked, for the purpose of showing that the defendant was only chargeable for tolls for the distance on the turnpike actually travelled by him, the plaintiff objected, but the Court overruled the objection and admitted the evidence for the purpose indicated. In support of this ruling the appellee insists that by the true construction of the twentieth section of the charter in this regard, he is only chargeable with tolls for the distance actually travelled, while the appellant contends that he must pay according to the distance between the gates, no matter how much of the road he has used. With respect to this controversy it is only necessary to say we think the appellant's

view the correct one, and it seems to be well supported by authority. *People vs. Kingston & Middletown Turnpike Co.,* 23 *Wend.,* 194; *Buncombe Turnpike Co. vs. Mills,* 10 *Iredell,* 30; *Stuart vs. Rich,* 1 *Caines,* 182; *Lincoln Avenue and Niles Centre Gravel Road Co. vs. Daum,* 79 *Ill.,* 299.

*Judgment reversed, and*
*new trial awarded.*

(Decided 13th December, 1883.)