THE PRESIDENT, MANAGERS AND COMPANY OF THE BALTIMORE AND YORKTOWN TURNPIKE ROAD *vs.* JOHN S. CROWTHER.

*Liability of a Turnpike Company—Traveller—Injury—Act of 1804, ch. 51—Obligation of Turnpike Company to keep its Road in Repair and Safe for Travel—Evidence— Venue—Corporation—Sec. 87, of Art. 75, of the Code— Where a Turnpike Company may be Sued.*

A turnpike company which derives a revenue from the use of its road by travellers, is directly liable to those who travel upon it for injuries occasioned by the want of repair of the road, without any express statutory provision imposing such a liability. The liability to pay tolls is a consideration for the undertaking on the part of the corporation to furnish a safe road for the use of the traveller as an equivalent.

The seventeenth section of the charter (Act of 1804, ch. 51,) of the Baltimore and Yorktown Turnpike Road, required that the road should be sixty-six feet wide, and should be kept open to this width, and that at least, twenty feet thereof in breadth, should be

macadamized as specified, and that the company during its contin-
uance, should "maintain and keep the road in good and perfect
order and repair." HELD:

1st. That under this provision of the charter it was the duty of the
company to keep the entire road, including the open space or dirt
portion on either side of the hard or macadamized part, in repair
and safe for travel.

2nd. That while such was the obligation imposed, it was not in-
cumbent upon the company to make the whole space of sixty-six
feet, including both the macadamized and side roads, perfectly
level transversely in every place, and to preserve the same grade
between the hard and side roads at all points.

3rd. But that where differences in grade existed, the company was
bound to make safe and convenient turn outs to the side roads, and
where such differences were so great and the slopes to the side
roads so precipitous as to be necessarily dangerous, such places
should be protected by proper safeguards.

In an action against a turnpike company to recover damages for in-
juries to the plaintiff's horse and buggy, occasioned by the unsafe
condition of the defendant's road, a surveyor who had made a plat
of the road at the place of the accident, is competent to testify
whether or not, the road at such place, from what he saw, was safe
for travel by wagons and carriages.

In such action it having been shown as a result of the accident, that
the horse ran away, evidence tending to show that a horse that has
once run away will do the like whenever opportunity offers, and
by reason thereof would be of less value in the market, is admis-
sible to assist the jury in determining the measure of damages.

In an action against a turnpike company to recover damages for in-
juries to the plaintiff's horse and buggy, occasioned by the unsafe
condition of the defendant's road, in having the macadamized or
artificial part thereof elevated several feet above the side or dirt
portion, the defendant will not be allowed to prove that other
roads are constructed in a similar manner—such fact furnishing no
excuse to the defendant for its neglect of duty with respect to its
own road.

In local actions the statement of the venue is an essential part of the
declaration; but in other actions it is immaterial, and its omis-
sion cannot be made a ground of objection.

A *corporation* is not within section 87, of Article 75, of the Code, which provides that "no person shall be sued out of the county in which he resides," until after a return by the sheriff "of the county in which he resides," of *non est* on a summons issued in such county.

A turnpike company may be sued in the county where its road is located, where it collects its revenues and tolls, where its operations of repairs are carried on, and where it exercises its corporate powers and privileges, though its principal office, where its books and records are, is located elsewhere.

APPEAL from the Superior Court of Baltimore City.

This suit was instituted in the Circuit Court for Baltimore County, and at the suggestion of the defendant it was removed to the Superior Court of Baltimore City, where it was tried. The case is stated in the opinion of this Court. The exceptions to the rulings of the Court below upon questions of evidence are also set out in the opinion of this Court.

*Seventh Exception.*—The plaintiff offered four prayers which the Court (PHELPS, J.,) rejected, and the same are omitted. The defendant offered the following prayers:

1. That the defendant, by its charter, was only required to make and keep in repair, an artificial road of a width of twenty feet, and if the jury shall find that the macadamized road of the defendant at the place in question, exceeded said width, and that the plaintiff's mare, while being driven thereon, took fright, and that the driver to whom the plaintiff had entrusted her, lost control of her movements, and that in consequence of such frightened condition of the said horse, and loss of control by the driver, the buggy to which the said horse was attached, was carried wholly or partly beyond the said macadamized road, and was upset, then the defendant is not responsible for the consequences of such upsetting, even although the jury shall also find that there was a declivity of three feet in depth at the edge of said road,

and that but for the existence of such declivity, said upsetting of the buggy might not have occurred.

2. That if the jury find that the mare of the plaintiff, mentioned in the evidence was young and skittish, and was known by the plaintiff to be so, and that plaintiff, with such knowledge, caused her to be driven by a boy in a buggy upon the macadamized road of the defendant, and that while so being driven thereon, the said mare took fright, upon seeing a four-horse wagon which was proceeding in the opposite direction, and became unmanageable and beyond the control of the driver, and ran over the edge of the said macadamized road, and thereby, the said buggy was upset; and shall further find that the said road at said place was more than twenty feet wide, and afforded abundant space for the safe passage, both of said horse and buggy, and said four-horse wagon, and that, but for such skittishness and fright of the plaintiff's mare, and incapacity or inability of the driver to control her movements, the said upsetting of the buggy would not have occurred, then the plaintiff is not entitled to recover in this action, and the verdict should be for the defendant.

3. That if the jury find that the plaintiff's horse was skittish, and that such skittishness was known to the plaintiff at the time he caused her to be driven by his servant on the defendant's turnpike road, and that the said horse while so driven and while on the macadamized road of the defendant took fright when about passing a four-horse wagon which was coming in the opposite direction, and became unmanageable and ran off of such macadamized road, and down a declivity at the side thereof, upsetting the plaintiff's carriage, and shall further find, that the said macadamized road at the said place was more than twenty feet in width, and that there was ample room for the safe passage of the horse and carriage of the plaintiff, had the said horse been well broken and

Baltimore and Yorktown Turnpike Road *vs.* Crowther.

ordinarily gentle and safe, and had not become frightened and unmanageable, then the plaintiff is not entitled to recover, and their verdict should be for the defendant.

4. That if the jury find that the turnpike road of the defendant at the place in question was reasonably safe and fit to be driven upon with a horse which was ordinarily gentle and manageable, and that the horse of the plaintiff took fright at an object which would not so have startled an ordinarily gentle and well broken horse, and that in censequence of her said frightened condition the said horse of the plaintiff got out of the control of the driver, and that the upsetting of the buggy was caused by said loss of control over the said horse by said driver, then the defendant is not responsible for the consequence thereof.

5. That the plaintiff cannot recover in this case, if the jury believe from the evidence, that any want of ordinary care on his part contributed to produce the injury complained of.

6. That if the jury find that the plaintiff's driver, by reason of youth or want of adequate strength or skill, was unfit to be entrusted with the duty of driving on the turnpike a horse such as that of the plaintiff, and that there was want of ordinary care on the plaintiff's part in so entrusting his said horse and buggy to the charge of said driver, and that the accident in question is attributable to the incapacity of said driver, then their verdict must be for the defendant.

7. That there is no evidence in this case legally sufficient to be considered by the jury as tending to show any negligence on the defendant's part, for which, under the pleadings in this case, the defendant can be held responsible, and their verdict, consequently, must be for the defendant.

8. That the defendant, by its charter, in evidence in this case, was required to make and keep in repair an artificial road of the width of twenty feet only.

The Court refused the defendant's prayers, save the fifth; which was conceded by the plaintiff. The Court gave an instruction of its own which is set out in the opinion of this Court. The verdict and judgment being for the plaintiff, the defendant appealed.

The cause was argued before ALVEY, C. J., MILLER, IRVING, RITCHIE, and BRYAN, J.

*Arthur W. Machen,* and *I. Nevett Steele,* for the appellant.

*John H. Morison,* and *Geo. Hawkins Williams,* for the appellee.

MILLER, J., delivered the opinion of the Court.

In this case an action was brought by the appellee against the Turnpike Company to recover damages for injuries to his horse and buggy. The declaration avers in substance that the defendants suffered their road, in a certain part of it, to be so out of repair as to be unsafe for travel, by reason of leaving an abrupt and high bank between the centre and metalled part, and the remainder of the road, without any safeguards to provide against the danger arising therefrom, and that whilst his servant was driving his horse and buggy on the road, and using due care, the horse unavoidably fell over this high and precipitous bank, and upset the buggy, which so frightened the horse that he broke the buggy and ran away.

The case as made out by the proof shows that at the place where the accident happened, or the injury was sustained, the metalled or macadamized part of the road was twenty-four feet in width, that for a considerable distance the side or dirt road was several feet below the grade of the macadamized part, and the bank between the two was very abrupt and precipitous; that as his servant was driv-

ing the plaintiff's mare and buggy along and on the macadamized part of the road, in this locality, he met a four-horse wagon, at which the mare became somewhat frightened, and shied and went down over this bank, by which the buggy was upset, and the mare then kicked herself loose from it and ran away.

Their counsel have strenuously argued that the company are not responsible on account of the existence of this bank, that under their charter they are bound to construct, grade and keep in repair and safe for travel, a hard or macadamized road of the width of twenty feet only, and, having done this, they have discharged every obligation which the incorporating statute imposes upon them in this respect; that in the grading of this twenty feet road, as the statute required it to be done, it was absolutely necessary that in places it should be raised higher than the adjoining sides, and having been authorized by the Legislature to create such inequalities, the company cannot be held responsible for their existence. And whether under the true construction of their charter, the appellants are thus absolved from all liability on account of such an unprotected declivity or bank as that described in the testimony, is the principal question in the case. We have recently said that the charters granted to this and other like companies by the Act of 1804, ch. 51, are to be liberally construed in reference to the powers and privileges thereby conferred upon the several corporations (*Balto. and Fredericktown Turnpike Co. vs. Routzahn*, 61 *Md.*, 37,) but the question as to the extent of the obligation now to be considered, has never before arisen in this Court.

There can be no doubt as to the general proposition that a turnpike company which derives a revenue from the use of its road by travellers, is directly liable to those who travel upon it for injuries occasioned by the want of repair of the road, without any express statutory

provision imposing such a liability. In such a case the liability to pay tolls is a consideration for the undertaking on the part of the corporation to furnish a safe road for the use of the traveller as an equivalent. *Davis vs. Lamoile County Plank Road Co.*, 27 *Vt.*, 602. And it would seem to be very clear also that such a defect as that described in this case, and in such a location, constitutes such want of repair as will render the company liable to a traveller for injuries resulting therefrom, unless there be some provision in their charter which relieves them from such liability.

The provision of the charter relied on as giving this relief is the 17th section of the Act of 1804, ch. 51. The road was required to be sixty-six feet wide, and this section provides that the company shall cause it to be "*kept open to this width* and shall cause twenty feet thereof, in breadth, *at least,* to be made an artificial road, which shall be bedded with wood, stone or gravel, or any other hard substance, well compacted together, a sufficient depth to secure a solid foundation to the same, and the said road shall be faced with gravel or stone pounded, or other small hard substance, in such manner as to secure a firm, and as near as the materials will reasonably admit, an even surface, and so nearly level in its progress as that it shall in no place, except over the Catoctin and South mountains, rise or fall more than will form an angle of four degrees with an horizontal line, and shall forever hereafter, during the continuance of said incorporation or incorporations, maintain and keep *the same* in good and perfect order and repair."

This provision must receive a reasonable construction in reference to the work to be accomplished and the object to be attained, that is to say, the construction and keeping in repair a public highway safe for ordinary travel throughout its entire length. The right given in other sections of the charter to erect gates and receive tolls is the foundation of the obligation to construct and keep in

repair such a highway. It is required that *at least* twenty feet of the allotted space of sixty-six feet shall be metalled or macadamized, as specified, and this constitutes the hard part of the road. If this be built in the centre of the location, there will remain of the sixty-six feet, required to be *kept open*, a space on either side of twenty-three feet for public use. It is matter of common knowledge that on these side spaces there are common dirt side roads which the public have constantly used and travelled upon, and we think it clear that this section contemplated that such side roads should be made and used for that purpose. The requirement that the whole space of sixty-six feet should be kept open for public use is inconsistent with the idea that the Legislature contemplated the construction of a road only twenty feet in width. Moreover the twenty feet is not prescribed as a limit of the macadamized or hard part. It is required to be that wide " *at least*," thus giving the company a discretion to make it wider wherever they chose, or whenever, in their judgment, safety required it to be wider. Wherever this widening was not made and side roads were used, we are clearly of opinion it became the duty of the company to make them safe for travel and to keep them in repair. We do not mean, however, to say that it is incumbent upon them to make the *whole space* of sixty-six feet, including both the hard and side roads perfectly level transversely in every place, for that would prevent the construction of ditches absolutely necessary for drainage. Nor do we mean to say that no differences in grade or level between the hard and side roads can be permitted in any place. It is well known than when these roads were originally built and completed, such differences did exist in certain localities, and this was probably owing to the great expense that would attend the grading of the side roads to the level of the hard one in every place throughout its entire length. Such differences in grade undoubtedly existed when the

Legislature passed the Act of 1811, ch. 203, by which these roads, on their completion, were "confirmed" as then "located, turnpiked and licensed." But we do hold that where there are such differences the company is bound to make safe and convenient turn-outs to the side roads, and where they are so great and the slopes to the side roads so precipitous as to be necessarily dangerous, such places should be protected by proper safeguards. This, after a careful consideration of the subject, is our construction of this section, and, in our judgment, it is not only a fair and reasonable one, but as favorable to the company as the statute will possibly admit.

It follows from what we have thus said, that the Court below committed no error in rejecting the first, seventh and eighth instructions asked for by the defendants, which assert the propositions that the only obligation resting upon them under their charter was to make and keep in repair an artificial road of the width of twenty feet only, and that there was no evidence of any negligence on their part entitling the plaintiff to a verdict. The legal propositions contained in the other rejected prayers of the defendants are covered by the instruction given by the Court in lieu of those asked on both sides, to the effect that if the jury find from the evidence that the plaintiff's driver was deficient upon the occasion in question in using such care and skill as ordinarily careful and skilful drivers are accustomed to use under similar circumstances, and that but for the want of such care and skill the accident complained of would not have occurred; or if they find that the plaintiff's mare was an unsafe and unfit animal to be driven upon a public road, and that the plaintiff knew it, or might have known it, and that the accident would not have occurred if the mare had been ordinarily gentle and well broken, then their verdict must be for the defendants, otherwise the plaintiff is entitled to recover such amount as the jury may find from the evidence will compensate

him for any injury to his mare and buggy in consequence
of such accident, provided they find that the same was
caused by the perilous condition of the defendants' road,
and that but for such perilous condition would not have
occurred.   This instruction, in connection with the defen-
dants' fifth prayer, which was conceded, gave the jury all
the law the case required, and certainly all that the de-
fendants could rightfully demand.

The defendants also took six exceptions to the rulings
of the Court upon questions of evidence, and these we shall
consider in their order.

1st.  In the first exception the plaintiff asked Mr.
McLean, the surveyor, who had made a plat of the road
at the place of the accident, whether, in his opinion, from
what he saw of it, the road there was safe for travel by
wagons and carriages?   The Court allowed this question
to be put, and we discover no error in this ruling.   The
witness was not produced as an expert, nor was this a
matter in which the testimony of experts was needed.
Whether this bank or declivity rendered the road unsafe
for travel was a matter about which men of ordinary intel-
ligence could speak as well as experts in road-making,
and the testimony of such witnesses is often resorted to in
such cases.  *Beatty vs. Gilmore,* 16 *Penn.,* 463 ; *Taylor
vs. Town of Monroe,* 43 *Conn.,* 45.

2nd.  It does not appear that the question allowed to be
asked the witness in the second exception was ever
answered by him, or that his answer thereto was in any
way to the prejudice of the defendants.   From aught that
appears, it may have been favorable to them.   There is,
therefore, nothing to be found in this exception which will
justify a reversal of the judgment.  *Lawson vs. Price,* 45
*Md.,* 133.

3rd.  In this exception a witness was asked what was
the usual result with a horse after running away? to
which he answered, "they repeat it whenever an oppor-

tunity offers itself." It seems to us clear that this evidence was properly allowed to go to the jury on the question of damages, as tending to show that the mare would be of less value in the market by reason of having ran away on the occasion of this accident.

4th. The Act of 1801, ch. 77, was one of the antecedent statutes relating to the location and construction of these turnpikes, which seems to be referred to in the 17th section of the defendants' charter, and we find no error in the ruling allowing it to be read in evidence to the jury.

5th. The defendants offered to prove by several witnesses that it was a common thing on other turnpikes and county roads in Baltimore County to find the central or artificial portions elevated above the sides fully as much and quite as steeply as the macadamized part of the defendants' road was at the place in question, but the Court sustained the plaintiff's objection to the admissibility of this evidence and refused to permit it to go to the jury; and in our opinion this was also a correct ruling. It was the duty of the jury to decide whether this particular road was safe for travel by evidence of its actual condition, and not by comparing it with the condition of other roads. The fact that similar defects existed in other roads affords the defendants no excuse for their neglect of duty with respect to their own road. This same question has, in our judgment, been rightly decided by the Supreme Court of Massachusetts in a number of cases. *Bacon vs. The City of Boston*, 3 *Cush.*, 174; *Kidder vs. Inhabitants of Dunstable*, 11 *Gray*, 342; *Hinckley vs. Inhabitants of Barnstable*, 109 *Mass.*, 126; *George vs. City of Haverhill*, 110 *Mass.*, 506.

6th. A witness for the plaintiff having testified that a kicking-strap is generally used to prevent horses from kicking, was asked, on cross-examination, whether it is customary to use such straps on horses not addicted to kicking, or where kicking is not apprehended? The

Court sustained the plaintiff's objection to this question, and refused to allow it to be put, and in this we find no error. The plaintiff's mare was driven with a strap of this character on the occasion of the accident, but why and for what purpose it was used was explained by other witnesses whose testimony went also to the question whether she was an ordinarily safe and gentle animal, fit to be driven on a public road or not. As to this there was ample proof, *pro* and *con*, and from these witnesses the jury had full information on that subject. Besides, it is clear from the proof (which is all one way on this point), that the kicking done by the mare on this occasion was the result and not the cause of the accident. We cannot see that any possible injury was done to the defendants by the ruling complained of in this exception.

The defendants also moved in arrest of judgment, and have alleged as one ground for the motion, that there is no *venue* laid in the declaration. Although it is true the declaration contains no formal statement of a *venue*, yet the record shows that it was *filed* in the Circuit Court for Baltimore County, and we think the law upon this subject is correctly stated in 1 *Poe's Pl. & Pr.*, sec. 585, where the learned author says: " The declaration ought properly to state the *venue*, which is intended to indicate the place or county in which the facts constituting the cause of action are alleged to have occurred, and in which the case is to be tried. In local actions it is an essential part of the declaration, but in other actions it is *immaterial*, and its omission cannot be made a ground of objection."

Another ground taken in support of the motion is that the suit was illegally instituted in the Circuit Court for Baltimore County, because the defendant corporation was and is a resident of Baltimore City. It also appears that the defendants moved the Court of Baltimore County to quash the summons issued against them by that Court, and to enter a *non pros.* in the case, upon the ground that the

Baltimore and Yorktown Turnpike Road *vs.* Crowther.

principal office of the company was and still is in Baltimore City. Upon the hearing of this motion it was admitted and agreed that the office of the defendant, where its books and records are, and have been, kept, is, and always heretofore has been, in the City of Baltimore where its stockholders and directors' meetings have always been held ; that the toll-gates on the road are now all situated in Baltimore County; that it owns and uses a horse railway track, laid under the Acts of 1860, ch. 257, and 1865, ch. 115, one terminus whereof is in the City of Baltimore, and the other at Towsontown, in Baltimore County ; and that there has been in this case no return of *non est* on a summons issued against the defendant in Baltimore City. The Circuit Court for Baltimore County overruled the motion to quash the writ. This ruling presents a question of some difficulty, and we have given it a careful consideration. We agree with counsel for the appellee that a corporation is not within the 87th section of Art. 75 of the Code, which provides that " no *person* shall be sued out of the county in which *he* resides " until after a return by the sheriff " of the county in which *he* resides " of *non est* on a summons issued in such county. The rules of interpretation laid down in our Code do not (as they do in most of the States) provide that the word " person " shall be construed as including " corporations." But suppose we are wrong in this, and that the section does apply to corporations, still the question remains, where is the legal residence of this corporation for the purpose of being sued ? Its charter does not fix its residence by providing that the meetings of its stockholders and officers shall be held in any particular place, as was done in the charter of the Cape Sable Company referred to in 3 *Bland*, 657. The Act of 1804, ch. 51, sec. 9, simply says on this subject, that the " president and managers shall meet at such times and places as shall be ordained by their by-laws." If, therefore, its legal residence is to be determined solely by the places of such

meetings, it may be made ambulatory at the will of its officers. Neither do any of our subsequent statutes in regard to suits against corporations seem to embrace this case. The Act of 1868, ch. 471, sec. 210, provides that any incorporation incorporated under the general incorporation laws of this State shall be sued in the County or City of Baltimore, as the case may be, "in which the certificate of incorporation is required to be and has been recorded;" and by the Code, Art. 77, sec. 3, it is provided that actions against railroad companies for certain kinds of injuries, shall be brought in the county or city "where the injuries shall have been done." Our revenue laws provide for the assessment of the real property belonging to corporations in the county or counties where it is situated, while their capital stock is assessed to the respective stockholders wherever they may reside ; but such legislation throws very little light upon the question now under consideration. In the absence then of any express statutory regulation on the subject, we must fall back upon the general rule of law relating to the legal residence of a corporation. This is very clearly stated in *Boone on Corp.*, sec. 33, where it is said : "The place of residence of a corporation is the place where its principal office is located *or* where its principal operations are carried on," and then it is added : "In legal contemplation a railroad corporation resides in the counties through which its road passes ; or in the county or town upon the line of its road where its principal office and the centre of its business operations are situated." The authorities bearing upon the subject are collected in the appellee's brief, and we need only to refer to the case of *Richardson & Co. vs. Burlington, &c., Railroad Company*, 8 *Iowa*, 260, where it was clearly laid down that a corporation, like a railroad company, in legal contemplation resides in the counties through which the road passes, and in which it transacts its business ; that it has a legal residence where it exercises corporate power and

privileges. "This company," say the Court, "is as much engaged in prosecuting the enterprise for which it was brought into being, in the County of Henry as in the County of Des Moines. It there operates its road, and exercises corporate powers and functions, and there it may be sued." The analogy between a railroad and a turnpike corporation is perfect, and applying the rule thus established, to the present case, it would seem to be clear that this corporation may be sued in Baltimore County where its entire road is located, where it collects all its revenues and tolls, conducts all its operations of repairs, where all the labor bestowed upon its property is done, and where, in short, it exercises all its corporate powers and privileges.

*Judgment affirmed.*

(Decided 23d June, 1885.)