# THOMAS A. HARRIS *vs.* CONSOLIDATION COAL COMPANY.

*Qualification of Expert to Testify as to High Pressure Air Pipe in a Mine—Action by a Miner for Injuries Caused by Bursting of Air Pipe in Gallery of Mine—Instructions to the Jury—Fellow-Servants.*

A witness cannot be permitted to testify as an expert unless his knowledge and fitness as such in that particular subject be first established to the satisfaction of the Court, and this may be done by an examination of the witness himself or by the evidence of others.

A witness who testifies that he had learned his trade as machinist with a railway company, and had run locomotives and tramroad engines; that he was familiar with high-pressure air pipes, and knew the effects of sulphur water upon them, but who is not shown to have any knowledge of machinery in mining plants, or of the usual or proper method of inspection thereof, and who had never worked in a mine, is not qualified as an expert to testify as to what was the probable cause of the bursting of a high-pressure air pipe, or whether a proper testing of the pipe would have disclosed the defect which caused it to burst, or whether a pressure of compressed air of nine hundred pounds to the square inch in a steel pipe of a certain thickness is dangerous, or whether it is safe to maintain such steel pipe in sulphur water in a heading along which workmen passed, or as to what is the proper method for testing such pipes, and whether the method adopted by the defendant was a proper one.

Plaintiff, a miner employed in defendant's coal mine, was accustomed to walk along a heading or gallery leading from the mouth of the mine to a room where he worked. In this heading there was a steel pipe two and a half inches in size, and five-sixteenths of an inch thick, which conveyed com-

pressed air to engines within the mine by which motors carrying coal were operated. Sometimes this pipe was more or less under sulphur water which dripped from the sides of the mine. Plaintiff alleged that the high pressure of the air in the pipe and the weakening of the pipe from the sulphur water caused the same to burst while he was walking along the heading, thereby injuring him; also that a manway by which access to his place of work could be had, was knee-deep in water and therefore unavailable. The defendant proved that it employed a man whose duty it was to look after the machinery and the pipes and to report any defect therein, and that on the evening before the accident, the pipe was in good condition. A prayer offered by the plaintiff instructed the jury that if they found the above-mentioned facts as to the location of the pipe, and also that the pipe was negligently maintained close to the ground, and largely under sulphur water and that sulphur water weakens pipes of this kind, and that said heading was dangerous for the miners to pass through, and that the defendant knew or ought to have known of the danger, and that this heading was the only available entrance for the miners, although there was a manway which was not in an available condition, then their verdict should be for the plaintiff. *Held,* that the plaintiff is not entitled to complain on appeal that the trial Court granted this prayer after striking from it the reference to the manway.

*Held,* further, that a prayer offered by the defendant is correct which instructed the jury that if the bursting of the pipe was occasioned by the negligence of the inspector employed to look after the air pipe, then the inspector was a fellow-servant with the plaintiff, and the verdict must be for the defendant unless the jury further found that the defendant was negligent in employing said inspector. This prayer merely leaves it to the jury to find whether the injury was occasioned solely by the negligence of the inspector, and does not exclude from their consideration any other kind of negligence on the part of the defendant.

A man employed by a mining company to look after the pipes and machinery used in the mine, and to repair or report any defect therein, is a fellow-servant with a miner.

Whether one employee is a fellow-servant with another, or a vice-principal, is a question of law for the Court when the facts are undisputed.

*Decided June 29th, 1909.*

Appeal from the Circuit Court for Allegany County (HENDERSON, J.).

The prayers referred to in the opinion of the Court are as follows,—the parts struck out by the trial Court being in italics and in parenthesis.

*Plaintiff's 1st Prayer.*—If the jury believe from the evidence that the defendant is a corporation engaged in operating a coal mine known as "Ocean Mine No. One" in Allegany County, Maryland, and was operating said mine on the 5th day of February, 1907, and prior thereto, and that the rooms of said mine were connected with its mouth by a long underground heading through which the employees of the defendant were accustomed to walk in passing to the rooms in which they work, and if the jury further find that the defendant pumped compressed air of great pressure through a pipe leading from the mouth of the mine along said heading underground to a place within said mine at which the compressed air was transferred to a compressed air charging station, and further find that the said pipe was negligently laid and maintained along the side of said heading close to the ground and largely under sulphur water and that sulphur water weakens pipes of the kind used in this place by the defendant, (*and further find that the only available entrance for employees or miners to enter said mines was in and along said heading, and along and near the said pipe, even though the jury may find there was a man-way intended for the use of miners that was not available condition for the employees to pass through*) and if the jury further find that the said heading was dangerous and unsafe for the miners and employees of said company to pass through (*and if the jury further find that the*

*defendant failed to provide any other available means of en-*
*trance for the miners than through the said heading, except*
*the man-way if they find the said man-way was not availa-*
*ble*) and if the jury further find that the plaintiff on the
5th day of February, 1907, was employed by the defendant
and in the line of his duties and employment was passing
through the said gallery or heading to the rooms of said
mine at which he was employed by the defendant to dig coal
and that while walking along said heading the plaintiff Har-
ris was knocked down by the bursting of a pipe in said gal-
lery, and that the bursting of the pipe and injury to the plain-
tiff were caused by the negligence of the defendant (*in fail-
ing to maintain a safe place for him to pass through or*) in
failing to properly place and maintain said pipe while the
plaintiff was in the exercise of due care and caution on his
part, and that by reason of the bursting or explosion of said
pipe the plaintiff was injured, and further find that the de-
fendant knew that the place was dangerous and unsafe or by
the exercise of ordinary care could have known that it was
dangerous and unsafe, and further find that the plaintiff was
ignorant of the unsafe and dangerous condition of the said
heading and the plaintiff was using due care and caution on
his part, then the plaintiff is entitled to recover in this action
and the verdict of the jury must be for the plaintiff.
(*Granted.*)

*Plaintiff's 2nd Prayer.*—If the jury find from the evi-
dence that at the time of the accident or injury to the plain-
tiff for which this suit is brought, the plaintiff was in the em-
ploy of the defendant on his way through the heading to his
work as described in the testimony and at that time the de-
fendant operated said mines and in the said heading through
which the plaintiff was traversing as aforesaid, was oper-
ating a high pressure steel pipe conveying compressed air of
from 400 to 900 lbs. a square inch pressure, and that the said
pipes lay to some extent in sulphur water, and that sulphur
water eats into and weakens pipes of this kind, and further
find that at the time of the accident the said heading was

eight or nine feet wide through which was laid a track and rails over which passed motor cars carrying coal when the said mines were in operation and further find that through the said heading passed a large force of coal diggers and other workmen of from one hundred to one hundred and eighty men daily (*and further find that the man-way referred to by the witnesses was not an available one for the said workmen to pass through on account of the quantity of mud and water in it, and that therefore the said workmen were required to travel the heading instead of the man-way*) and if the jury shall further find that the pipe of compressed air exploded under its high pressure and sulphur water and with great force and violence knocked down the plaintiff while he was using the said heading as a means of passage to his work, then the jury are instructed that they have a right to infer in the absence of any evidence on the part of the defendant showing how the accident happened that the explosion of the pipe was occasioned by the negligence of the defendant in not providing safe appliances or a safe place for the appliances, and if they find such negligence of the defendant, and that the plaintiff was injured thereby, then their verdict must be for the plaintiff unless they further find from all the circumstances of the case that the plaintiff was guilty of a want of ordinary care and prudence which directly contributed to the injury. (*Granted.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS and WORTHINGTON. JJ.

*Albert A. Doub* and *A. Taylor Smith,* for the appellant.

*Robert H. Gordon* and *Wilbur V. Wilson,* for the appellee.

BURKE, J., delivered the opinion of the Court.

The appellee on this record is a body corporate engaged in mining coal in Allegany County in this State. It owned and

operated a coal mine in that county known as "Ocean Mine
Number One." The appellant was a workman employed by
the appellee to work in that mine, and brought this suit to
recover damages for personal injuries received by him there-
in on the 5th day of February, 1907. The verdict and judg-
ment were for the defendant, and this is the plaintiff's ap-
peal, which presents for review seven rulings of the Court
below made during the progress of the trial. Six of these
relate to matters of evidence, and the other to the Court's
action upon the prayers.

The rooms of this mine, in which the men worked, were
connected with the mouth of the mine by an underground
heading or gallery several miles long, through which the
workmen of the defendant were accustomed to walk in going
to and from their work. The defendant had installed an
engine and certain machinery at the mouth of the mine, and
compressed-air engines within the heading or gallery men-
tioned, and had laid and maintained a two and a half inch
steel air line pipe of the thickness of about five-sixteenths of
an inch along the side of this heading. This pipe was laid
close to the ground, and in wet seasons was largely covered
by sulphur water which found its way into the gallery. From
the machinery and engine at the mouth of the mine com-
pressed air of great pressure was pumped through this pipe
to a point within the mine at which it was transferred to
compressed air engines, which were used to haul coal over a
motor road in the heading from the rooms of the mine to the
bottom of the slope of the mine. The pressure of this pipe
was about nine hundred pounds to the square inch.

On the morning of the accident, while the appellant was
passing through this heading to the room in the mine in
which he was employed by the defendant to dig coal, the
pipe suddenly burst and injured him. At the point where
it burst the pipe was covered with sulphur water. The decla-
ration alleges that the pipe was negligently laid along the
side of the heading so close to the ground and largely under
water which drips from the side of the gallery, and that the

pipe which carried the compressed air through the heading was not of sufficient strength to bear the high pressure of the compressed air which was forced in and through it from the machinery and engine at the mouth of the mine; that the only entrance for the employees, or miners, was in and through the heading and along and near the pipe line, and that because of the high and dangerous pressure of the compressed-air transported through the heading and the insufficiency of the pipe to support or sustain this high pressure through the same, which was negligently laid and allowed to be, or to become covered with sulphur water and thereby weakened, it was dangerous and unsafe for the miners and employees of the defendant to pass through the gallery into the rooms of the mine. It is also alleged that the place was dangerous because of the neglect of the defendant to provide any other safe or available means of entrance to the rooms of the mine. The precise neglect which caused the injury is stated as follows: "That the high pressure of compressed air in said pipe caused the bursting of said pipe—and that the explosion therefrom was the cause of the said injuries to the plaintiff, while he was passing to his work, in the line of his duty, in the exercise of due care and caution on his part, in said dangerous and unsafe place of said gallery, and that in consequence of such dangerous and unsafe condition of said place he was knocked down and injured by the bursting of said pipe; and that the defendant knew that said place was dangerous and unsafe, or by the exercise of ordinary care and prudence could have known that it was dangerous and unsafe and in time to remedy and prevent said accident, and that the plaintiff was ignorant of the unsafe and dangerous condition of said heading or gallery of said place, and could not by the use of ordinary care and prudence on his part to have known the same."

To prove his case the plaintiff introduced his own testimony and that of seven other witnesses, viz: Thomas S. Harris, John Eagan, Daniel Nolan, and Drs. A. B. Smith and E. L. Jones, and L. Lee Pagenhardt. The exceptions to the

ruling of the Court upon questions of evidence were all taken during the examination of the last-named witness. The plaintiff testified that he was a miner and twenty-six years old; that he had been working in this particular mine for about eight years; that he described the pipe line and engines and machinery and the purposes for which they were applied as set forth in the declaration. He said that the pipe carried a high pressure of compressed air, the gauge on the motors showing nine hundred pounds, and that the pipe was laid in sulphur water; that the motors were used to haul the cars in and out of the mine through the heading; that the workmen to the number of about 150 to 180 passed through this heading to their work; there was a manway leading into the mine, but on the day of the accident it was about kneedeep with water and that was the reason he did not use it, but he came out this manway after the accident. He said the compressed air pipes, which were in use that day, exploded and knocked him down; that the explosion put out the lights in the mine and rendered him unconscious—"it sounded like the world was coming to an end." He did not know whether anything had struck him; his head was injured and he was soaked with water. He went that afternoon to see Dr. Smith, who treated the injury to his head. He testified he suffered from nervousness and sleeplessness as the result of the explosion, and that his hearing in his right ear was thereby destroyed. He said he never saw anyone making an inspection of the pipes, but that before the accident he regarded the heading as safe.

Thomas S. Harris, the father of the plaintiff, testified that he had worked in this particular mine, but at the time of the accident was employed by another coal company; that he knew the pipes spoken of; that sometimes they were underneath, and sometimes above the water; but at the time of the accident he could not say whether they were above the water or not; that he left the employment of the defendant in January before the accident. He said the manway was not fit to travel; that it was in a miserable condition; "the

motor road is not safe; when a motor goes in it fills up the whole heading, and if you met it in the dark, it would kill you; nobody could hear you holler." He never knew of any inspection or testing of the pipe.

John A. Eagan confirmed the testimony of the preceding witness as to the condition of the manway, and said the men used the motor road, and walked on the rails to keep dry; he said the gauge on the motor cars showed a pressure of nine hundred pounds.

Daniel Nolan testified he knew the point of the accident described by the plaintiff, and that the pipe laid in sulphur water, he supposed, mine water, "under the water in spots and places;" that he never saw the miners use the manway; that they used the motor road.

Mr. Tucker testified that the pipe was a two and a half inch steel pipe of the thickness of five-sixteenths of an inch, and Dr. Smith testified as to the nature and extent of the plaintiff's injuries. L. Lee Pagenhardt testified that he was a metal worker, and had worked in all kind of metals for thirty-five or thirty-eight years. Asked if he was familiar with iron, cast iron and steel, he replied that he was "about as near an expert as anyone you have in Maryland or any other State." He said that no cast iron or steel will stand sulphur water any great length of time; that it will perforate it in a short time, unless the pipe is very heavy; that a defect in the pipe would not be apparent by merely looking at it: that it would be necessary to give it a test, and that a test would not always disclose the defect. He said he had worked "pretty much all over the United States, but not for no mining company." He said sulphur water would eat through metal quicker than anything else; that he had learned his trade as a machinist with the Baltimore and Ohio Railroad Company, and had run locomotives and tram-road engines at various places; that he was familiar with high-grade pressure steel pipes and knew the effects of sulphur water on them. He was asked the following questions:

"1. State whether or not it is safe for the employees for a company to maintain steel pipes—high-pressure pipes—which carry compressed air of nine hundred pounds to the square inch, in sulphur water, when the heading through which it passes is travelled daily by one hundred or more men?

"2. According to the testimony of the plaintiff in this case, Mr. Harris on the 5th day of February, 1907, when passing through a heading eight or nine feet wide; in that heading was a pipe, with compressed air of the pressure of about nine hundred pounds to the square inch; the pipe laid in sulphur water, partly or entirely, and had been lying in that state for some time; as he was passing along suddenly there was a tremendous roar; the pipe bursted, knocking down the plaintiff and injuring him. Now, will you state to the jury what was probably the cause of the bursting of that pipe or what was the cause of that injury?

"3. If there was defect in the pipe that caused the accident, would a proper testing of the pipe have disclosed this defect?

"4. State whether a pressure of compressed air of nine hundred pounds to the square inch in a pipe five-sixteenths of an inch thick, when the pipe is steel, laid in sulphur water and in a narrow way eight feet wide travelled daily by one hundred and fifty men at least, is or is not dangerous?"

The Court, upon the objection of the defendant, refused to allow the witness to answer either of these questions, and these rulings constitute the first, second, third and fourth bills of exception.

This witness was not shown to have had any knowledge of the machinery at the defendant's mine, or of mine plants of any kind, or to have any knowledge of their construction, or of the usual or proper method of inspection or testing of mine plants of any description. The Court held that he had not qualified himself as an expert to testify as to the matters embraced in the interrogatories, and in these rulings we agree. The general rule as to the admissibility of expert evidence

is that persons having technical and peculiar knowledge on certain subjects are allowed to give their opinions when the question involved is such that the jurors are incompetent to draw their own conclusions from the facts without the aid of such evidence.    12 *Am. and Eng. Ency. of Law,* 422; *Baltimore and Yorktown Company* v. *Crowther,* 63 Md. 558; *Turnpike Company* v. *Cassell,* 66 Md. 419.

The principal object in view in the examination of expert witnesses being to elicit from them opinions or conclusions from the facts, rather than the facts themselves, this species of testimony forms in this respect a notable exception to well-established rules of evidence.    The rules governing the introduction of this species of testimony should, therefore, not be relaxed, but should be strictly enforced with the greatest caution and discrimination.    Before a witness can be allowed to testify as an expert his fitness and character as such should be established by a preliminary examination, and in ascertaining his competency the Court may examine the witness himself, or may find the fact from the testimony of others. 8 *Ency. of Pl. and Prac.,* 744, 745.

"How much knowledge a witness must possess before a party is entitled to his opinion as an expert, which, in the nature of things, must be left largely to the discretion of the trial Court, and its rulings thereon will not be disturbed, unless clearly erroneous."    *Chateaugay Ore and Iron Company* v. *Blake,* 144 U. S. 476.

In *Dashiell* v. *Griffith,* 84 Md. 377, the Court said : "It is an unsafe practice in the admission of testimony to allow witnesses to speak as experts unless the Court is well satisfied that they possess the requisite qualifications, not alone on this account, but the effect of such testimony is most difficult to estimate, from the fact that undue importance not infrequently attaches to it, and gives to it an importance in the minds of a jury to which it is not fairly or reasonably entitled."    The Court then quotes from 1 *Wharton on Evidence,* section 434, as to the distinction between the expert and non-expert witness, "that the non-expert testifies as to the

conclusions which may be verified by the adjudicating tribunal; the expert to conclusions which cannot be so verified. The non-expert gives the results of a process of reasoning familiar to every-day life; the expert gives the results of a process of reasoning which can be mastered only by special science." The Court further says that "the rule allowing expert evidence will, in our opinion, be less objectionable and more conducive to justice if it be somewhat restricted, rather than relaxed. It is largely within the direction of the trial Judge, but always subject to the opinion of the appellate Court."

In *Turnpike Company* v. *Leonhardt,* 66 Md. 77, it is said: "It is proper to lay before the jury all the facts which are necessary to enable them to form a judgment on the matters in controversy; and where the subject under investigation required special skill and knowledge, they may be aided by the opinions of persons whose pursuits or studies or experience have given them a familiarity with the matter in hand, but where the question can be decided by such evidence and knowledge as are ordinarily found in the common business of life, the jury are competent to draw the inferences from the facts without having the opinion of witnesses." Assuming that the matters embraced in the questions were proper subjects for expert evidence, we are satisfied that the witness was not qualifid to testify as an expert respecting them.

The Court refused to allow this witness to testify, when recalled at the close of the defendant's case as to the proper method of testing the pipes in question; nor to allow him to testify that the method adopted by the defendant was not a proper one. For the reasons stated, the Court was right in this ruling which constitutes the fifth and sixth bills of exception.

In *South Baltimore Car Works* v. *Schaefer,* 96 Md. 107, it is said: "There can be no doubt of the general rule which requires an employer, after providing proper and safe machinery to supervise, examine and test it as often as custom and experience require. *Thompson on Negligence,* 984. * * *

It was the duty of the plaintiff if he relied on failure to inspect to have offered some testimony which would have justified the jury in finding that the defect causing the injury was one which could have been discovered by the usual and ordinary methods of inspection commonly adopted by those in the same kind of business which was conducted by the defendant. 'Absolute safety is unattainable and employers are not insurers. They are liable for the consequences, not of danger, but of negligence, and the unbending test of negligence in methods, machinery and appliances is the ordinary usage of the business.' *Bailey, Master's Liability,* 23."

Before the offers embraced in the fifth and sixth exceptions were made, the Court inquired of the witness if he knew of the method of inspecting high pressure pipes used by those engaged in the mining business and the witness replied that he knew nothing about the mining business.

The defendant proved by the witness Clark that as the point where the accident occurred there was a kind of basin in the mine; water would accumulate there; that he was a trackman in the employ of the defendant, and it was his duty to keep the track in good condition; that he saw Harris after the accident, and that Harris told him he was not hurt but scared, and that he gave no evidence of being hurt as he went out of the mine; that the condition of the man-way was about the same as the motor road. The testimony of Dr. Fechtig and of the witness Campbell, tended to show that the plaintiff was not seriously injured. The witness Rempell testified that he usually travelled the manway; that it was wet and muddy, "but you had a chance to get through it dry footed, but you could not go through the motor way dry." Charles Shields was an employee of the defendant company at Ocean Mine Number One on the day of the accident. He was a member of what was called the "Chain Gang," whose duty it was to look after the pumps, mining machinery, and pipe line. He said it was considered his duty to examine the pipe line, and that he passed it three, four, five and six times a day; that if he saw anything wrong with it he either fixed

it, or reported it to be fixed, and it was attended to immediately; that it was never neglected.   In his examination in chief he testified as follows:

"Q. State what your means of inspection were?

A. My means of inspection, we consider when the pressure is on is a thorough test.

Q. When is that pressure put on?

A. It is on all the time.

Q. Is it on at night as well as day?

A. Yes, sir.

Q. Is it put on in the evenings when the engines stop running?

A. Yes, sir.

Q. Did you examine the pipe the evening before this accident occurred?

A. I believe I was the last man out by this point the evening before the explosion and nothing at all was the matter that I could see or hear.

Q. When there is a weakness in the pipe at a point or in the pipe, does it give any symptoms by which you can tell same?

A. Yes, sir.

Q. What is the symptom?

A. A blowing or bubble or a noise.   A little leak will make a noise.

Q. Did you examine the pipe carefully?

A. No, sir; except to go past it.   It was under water at times and at times it wasn't.

Q. How was the pipe fixed?

A. It laid along by the side of the road on 2 by 4 scantling, so as to keep it out of water and off the ground.

Q. Is that correct?

A. Exactly sir.

Q. Then it was not covered with water and at all times?

A. No, sir.

Q. Was this a very wet season of the year?

A. Yes, sir; very wet.

Q. How was the water in there at this particular time?

A. Well, I judge it would be about four inches deep on the rail at that particular time, because it was just at a wet season.

Q. How was it at other times at that place?

A. It was dry.

Q. Was the conditions there the ordinary conditions?

A. No, sir; I would say they were extraordinary."

On cross-examination he said that he had held this position with the company for about seven years; that the only method of testing the pipes, so far as he knew, was the one mentioned; that there are other men who have the same duty to perform; they are called the "chain gang," they look after machinery, make repairs, put in new pipes when necessary. The witness said that he was the one who examines the pipe line, and if the other men happen to be along they also examine it. That he inspected it frequently during the day, and if anything was wrong he repaired it. He said he could go through the manway without going through water or mud of any depth; that one could go through without getting his feet wet, and that he had been through a few days before the accident.

After the close of the whole case the plaintiff submitted three prayers and the defendant five for instructions to the jury. The plaintiff's third prayer was conceded. The Court modified the plaintiff's first and second prayers by eliminating the parts thereof enclosed in brackets. The reporter will set out these prayers in the report of the case, and will italicize the part stricken from each prayer. The Court granted the defendant's second and refused its other prayers. To the granting of the defendant's second prayer and the modification made by the Court to the plaintiff's first and second prayers, the plaintiff excepted. This is the seventh and last bill of exceptions.

By the defendant's second prayer the jury were told "that if they shall find that the bursting of the pipe was the result or occasioned by the negligence of Charles Shields the in-

spector employed by said defendant company and employed to look after the air pipe line in its mines, and was occasioned by his neglecting his duty in that respect that then and there the said Charles Shields was a fellow employee of the plaintiff and the jury must find for the defendant unless they shall further find that the defendant company was negligent in employing the said Charles Shields as its inspector and that there is no evidence to show any such negligence on the part of the defendant company in the employment of the said Charles Shields."

This being a suit by a servant against his master for personal injuries negligence is the *gravamen* of the action, "and the negligence alleged and the injuries sued for must bear the relation of cause and effect. The concurrence of both and the *nexus* between them must exist to constitute a cause of action." *Benedict* v. *Potts,* 88 Md. 55.

The only injury of which the plaintiff complains in the first and second prayers is the elimination therefrom of the parts we have indicated. In an earlier part of this opinion we transcribed the averments of the narr. which charge the negligence of the defendant upon which the plaintiff relied, and assuming that the case was one which should have been left to the jury the appellant had no good reason to complain of the modifications made by the Court to the prayers offered by him. The granted prayers submitted the whole case under the pleadings as fairly and as favorably to the appellant as he could expect. If it be conceded that the failure of the defendant to provide a safe and available manway was negligence, it must likewise be admitted that *that* negligence was not the cause of the injury sued for. Besides, the condition of the manway and the heading was well known to the plaintiff. If their condition were a source of danger to persons working in the mines, it was a danger which was open and obvious, and he must be held to have assumed all risks incident thereto. "An employee who contracts for the performance of hazardous duties assumes such risks as are incident to their discharge from causes open and obvious, the dangerous

character of which he had an opportunity to ascertain. *B. and O. R. R. Co.* v. *Stricker,* 51 Md. 47. One who remains in a service which necessarily exposes him to hazardous risks from causes open and obvious, the dangerous character of which he knew or had an opportunity of knowing, must be considered as having assumed such risks, and if injured in consequence thereof, has no claim against the employer. *Pennsylvania Railroad Company* v. *Wachter,* 60 Md. 395; *Yates* v. *McCullough Iron Company,* 69 Md. 370. This doctrine is firmly grounded in the law of this State, in the law of England and probably every State in the Federal Union, though usually stated as a general rule, constitutes in reality an exception to or qualification of the broad principle which requires the employer to use ordinary care to 'provide a reasonably safe' place in which the servant may perform his work."

There was no special exception filed to the defendant's second prayer. There was no proof that the defendant did not use reasonable care in the selection of Charles Shields, or that, after notice of his incompetency or negligence (if any such existed), it retained him in its service, and there can be no doubt that, upon the evidence, he was a fellow-servant with the plaintiff. Whether, upon a given state of facts a party is a fellow-servant, or a deputy master, or a vice-principal, is a question of law to be decided by the Court. In this case, where the facts are undisputed, it was the duty of the Court to decide whether under them Shields was a fellow-workman of the plaintiff or not. *Yates* v. *McCullough Iron Company, supra.*

It is well settled that if the injury sued for resulted from the negligence of Shields, a fellow-servant, the plaintiff cannot recover, as that negligence was one of the risks he assumed when he entered the service of the defendant. The prayer, therefore, announced a correct legal principle. The appellant insists, with great earnestness, that this prayer ignores the testimony showing the defendant's failure to provide a safe place for the plaintiff to work, and in failing to perform a

positive and non-assignable duty, and that it ignores the defendant's negligence in maintaining its high-pressure pipe in sulphuric acid water, and it ignores all reference to the duty of the defendant to provide a proper system of inspection and testing of the pipe. But we do not understand the prayer as being open to that objection. It does not exclude from the jury the consideration of any negligence on the part of the defendant causing the injury. All such evidence was fully left to the consideration of the jury under the first and second prayers granted by the Court. This prayer merely asserts that Shields was a fellow-servant of the plaintiff, and then leaves it to the jury to find that the injury was occasioned by *his negligence,* that is by his *sole negligence,* and then asserts that if they so find the plaintiff cannot recover.

We find no error in any of the rulings of the lower Court, and, therefore, the judgment will be affirmed.

*Judgment affirmed, with costs.*