739 A.2d 940

**STATE of Maryland**

v.

**Jerry THURSTON.**

No. 5734, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Oct. 29, 1999.

**658**

Christine K. McSherry, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Annapolis, for appellant.

Jay D. Miller (White, Miller, Kenny & Vettori, on the brief), Towson, for appellee.

Argued before WENNER, EYLER and JAMES S. GETTY (Ret'd, Specially Assigned), JJ.

JAMES S. GETTY, Ret'd, Specially Assigned.

The State of Maryland entered this appeal from a jury verdict awarding damages to the owner of a racehorse that was injured while training at a State owned racetrack.

## Background

A racehorse training center located in Cecil County is within the Fair Hill Natural Resources Management Area. Although the training center occupies land owned by the State, it is a separate legal entity. A grass racetrack, owned and operated by the State, is situated in the same area, but is not part of the training center. Racehorse owners may bring their horses from the training center to the track and exercise them, subject to the following conditions:

1. Purchase of a $25.00 gate pass for each use of the track.

2. Passes must be turned in at the gate.

3. Horses are not allowed inside the traffic cones placed on the track.[1]

---

1. The entire track is encircled by orange colored traffic cones. These cones are placed thirty-two feet from the inside rail and all riders are required to run their horses between the cones and the outside rail.

## *Facts*

On August 30, 1994, Gerald Thurston, the appellee herein, brought his horse, Lifespecialady, to the track. He hired a rider, Theresa Bouchard, to exercise the horse. Across from the entrance gate to the track was a forty-foot opening in the inside rail of the track. The opening allowed mowers and other vehicles access to the infield for maintenance of the infield. The manager of Fair Hill, Edward Walls, testified that it was customary to leave the forty-foot section open to facilitate the maintenance of the infield.

The only witness to what occurred on August 30, 1994, was the rider, Ms. Bouchard. She testified that the rail opening was directly across the track from the entry gate, but she did not notice the opening in the rail. As the horse was approaching the homestretch the second time around the track, she veered suddenly to the left toward the rail opening. As Lifespecialady went through the opening, the rider pulled her to the right, but the horse struck the open end of the rail, and a metal rod near the rail became impaled in her right side. Ms. Bouchard was thrown free as the horse fell. Fortunately, she was not seriously injured.

The appellee had gone to the grandstand to observe the horse through binoculars. He did not notice the open rail as the horse and rider entered the track, and he did not see the horse and rider fall.

Park Ranger Melvin Adam prepared an incident report. The orange cones placed around the track were thirty-two feet from the inside rail and the open area in the rail measured forty-feet, according to Adam. The riders were required to exercise their horses to the right of the cones.

The appellee testified that the horse recovered, but she won only one race in 1995 and he gave her away because she was no longer competitive. The jury decided that the track was negligently maintained and returned a verdict for the appellee amounting to $43,642.00. Of that sum, the value of the horse prior to the accident was assessed to be $30,000; the $13,642 balance covered veterinary expenses.

Appellant raises the following issues, which we have restated:

1. Whether the court erred in denying appellant's Motion for Judgment at the close of appellee's case for failure to establish primary negligence and failure to offer evidence that appellant breached a duty to warn appellee of a latent defect.

2. Whether the court erred in denying appellant's Motion for Judgment based upon appellee's contributory negligence for failing to observe the alleged negligent condition of the railing prior to running the horse.

3. Whether the court erred in allowing appellee to introduce evidence of subsequent remedial measures.

## DISCUSSION

### *Duty to Warn*

■ Admittedly, the owner of the horse was a business invitee while exercising his horse at the racetrack adjacent to the Fair Hill training complex. As such, he was owed a duty of ordinary care by DNR to maintain the premises in a reasonably safe condition. Included in the duty of ordinary care is the obligation to warn business invitees of latent or concealed dangers. *See Lloyd v. Bowles,* 260 Md. 568, 572, 273 A.2d 193 (1971).

In *Bowles,* the plaintiff tripped while exiting a doorway at a beauty parlor which was being remodeled. A plaintiff's verdict was set aside by the trial court. The Court of Appeals affirmed, stating that, even if the store owner realized that the doorway created an unreasonable risk of harm, there was no evidence that the owner had any reason to believe that the defect would not be discovered by the plaintiff.

■ We do not agree that the appellee in the present case has established either a concealed or latent defect in the premises. The gap in the rail was forty feet wide and directly across the track from where a rider and horse entered the track. A forty-foot opening in a continuous white rail was

certainly obvious to anyone walking a horse along the orange cones thirty-two feet from the rail. The rider, whether walking or galloping the horse, was some six feet above the ground with an unobstructed view of the track. Clearly, there was no latent defect that required any warning by the owner of the track.

### Failure to Correct Unsafe Condition

■ DNR also alleges that there was no primary negligence because the condition was not latent, and, therefore, the court should have granted its Motion for Judgment at the end of the plaintiff's case. Whether the evidence is sufficient to require that a court submit a case to the jury requires that the trial court assume the truth of all credible evidence on the issue and of all inferences deducible therefrom, and consider them in a light most favorable to the party against whom the motion is directed. *McSlarrow v. Walker,* 56 Md.App. 151, 158, 467 A.2d 196 (1983).

*Impala Platinum v. Impala Sales,* 283 Md. 296, 328, 389 A.2d 887 (1978), requires:

If there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then a trial court would be invading the province of the jury by declaring a directed verdict. In such circumstances, the case should be submitted to the jury and a motion for a directed verdict denied.

Maryland has gone almost as far as any state in holding that meager evidence of negligence is sufficient to submit the case to a jury. *McGarr v. Balto. Area Council, Boy Scouts of America, Inc.,* 74 Md.App. 127, 132, 536 A.2d 728 (1988).

The evidence presented by the appellee included testimony from James Michael Rogers, a horse trainer and former jockey, who stated that leaving open part of the rail, inside or outside, creates a "positively unsafe" condition, because racehorses are trained to focus on the rail. Rogers believed that "this horse focused on something it was just not used to seeing and made a decision that none of us can really answer for."

Ms. Bouchard stated that the horse was traveling approximately 35 miles per hour and "ducked in" the open gap in the rail. She added that when you are going that fast on a 1,500 pound animal "there's nothing you can do."

Christine Claggett, called by DNR as an expert, owns and operates a training center which includes a racetrack and a starting gate. Earlier in her distinguished career, she was the leading amateur jockey in the United States in 1993 and 1995. Ms. Claggett stated that she has a sixteen-foot opening into the infield of her ⅜ mile track and she has never had a horse attempt to leave the track because of the opening. Obviously, she did not consider the open area to be a negligent act. She explained that "when you are on a horse it can make its decisions, you don't always have control over the situation."

We perceive no error in the trial court's denial of DNR's motion for judgment at the end of the State's case. One expert believed the open rail area created a dangerous condition. A second expert disagreed. Both agreed that racehorses are unpredictable. Whether the failure to close the inner rail thirty-two feet distant from the area where the horses were running created a dangerous situation which was a proximate cause of the injury to the horse was for the jury to determine. It was not for the court to resolve as a matter of law.

### Contributory Negligence

In its second issue, DNR asserts that the racehorse owner was guilty of contributory negligence as a matter of law. The support for this argument is the failure of the owner to observe the open area of the inner rail which was in plain view. DNR relies on the case of *Hynes v. Hutzler Brothers Co.*, 261 Md. 345, 345, 276 A.2d 99 (1971). In that case, a customer fell in a Hutzler Store after colliding with a store employee. She sued the store. In her testimony, however, she admitted that she did not notice the employee at the time they collided. The court found her guilty of contributory negligence as a matter of law due to her failure to look where

she was going. A similar holding was applied in *Southern Md. Electric Co-op. v. Blanchard*, 239 Md. 481, 490, 212 A.2d 301 (1965). In that case, a man installing an antenna above his trailer was injured when the antenna came in contact with an uninsulated wire. He said he did not see the wire. The Court held that "the law ordinarily *charges* . . . a person of unimpaired vision with seeing an object which, if he had used his senses, he, in the nature of things, must have seen." *Blanchard*, 239 Md. at 490, 212 A.2d 301.

The cases cited are factually different from the case before us. The element added in the present case involves the unpredictable reaction of a racehorse to any distraction that may arise while the horse is running at or near full speed. All of the witnesses seem to agree that the horse decides the direction it is going and the rider has no control over a sudden change by the animal. Whether such a change is reasonably foreseeable is for the jury to decide.

The track was ⅞ of a mile long. A forty-foot gap is minuscule in relation to the length of the track. It is not unreasonable to conclude that the rider's attention as she entered the track was centered on the horse and the ground outside the cones, where she was required to ride. The owner went to the grandstand to clock the horse's speed. The proximity of the grandstand to the opening in the rail, or where the owner was located in the grandstand, was not established. He said he would have asked that the rail be closed if he had seen the opening. Whether he could have seen it is unclear. We do not conclude, however, that his decision to allow an accomplished rider to take the horse on the track, while he went to a higher area to view the horse run, was contributory negligence as a matter of law. The absence or presence of contributory negligence is generally for the jury to decide. *Moodie v. Santoni*, 292 Md. 582, 589, 441 A.2d 323 (1982) (quoting *Jackson v. Forwood*, 186 Md. 379, 47 A.2d 81 (1946)). It is only where the minds of reasonable persons cannot differ that the court is justified in deciding the

question as a matter of law. *Brown v. Bendix Aviation Corp.*, 187 Md. 613, 51 A.2d 292 (1947).

 Before the doctrine of contributory negligence can be invoked, it must be demonstrated that the injured party, the owner, acted or failed to act, with knowledge and appreciation, either actual nor imputed, of the danger of injury which his conduct involves. *See Hooper v. Mougin,* 263 Md. 630, 284 A.2d 236 (1971); *Rogers v. Frush,* 257 Md. 233, 262 A.2d 549 (1970). The burden of establishing contributory negligence, moreover, is on the defendant. We conclude that a trier of fact may conclude from the established facts in this case that the owner was guilty of contributory negligence. The facts, however, do not warrant a finding of negligence as a matter of law. The issue was properly submitted to the jury.

### *Subsequent Remedial Measures*

Finally, DNR alleges that the court erred in allowing the appellee to introduce evidence of remedial measures adopted by DNR after this accident. Maryland Rule 5–407 addresses this issue. It states:

(a) **In general.** When after an event, measures are taken which, if in effect at the time of the event, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event.

(b) **Admissibility for other purposes.** This Rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.[2]

---

2. In McLain, *Maryland Rules of Evidence* (1994), the author's comments relating to Rule 5–407 include the following:

　　The reasons supporting Rule 5–407 are as follows:

(1) The [remedial] evidence has *low probative value* with regard to negligence or fault (*e.g.,* hindsight is better than foresight).

(2) For *policy reasons,* people should be encouraged to take subsequent remedial measures, even if the steps taken are more than

In a scholarly discussion of the admissibility of remedial measures implemented after the happening of an event, Judge Alan M. Wilner traced the history of this subject in *Tuer v. McDonald*, 347 Md. 507, 701 A.2d 1101 (1997). Prior to the adoption of Rule 5–407, the Court of Appeals stated, we followed the common law rule articulated by the Supreme Court in *Columbia Railroad Co. v. Hawthorne*, 144 U.S. 202, 12 S.Ct. 591, 36 L.Ed. 405 (1892). The Supreme Court held in that case that evidence of measures taken after an accident, presumably to prevent a recurrence, was incompetent because

> the taking of such precautions against the future is not to be construed as an admission of responsibility for the past, has no legitimate tendency to prove that the defendant had been negligent before the accident happened, and is calculated to distract the minds of the jury from the real issue, and to create a prejudice against the defendant.

144 U.S. at 207, 12 S.Ct. 591.

Effective July 1, 1994, the Court of Appeals adopted Rule 5–407, which tracks generally Federal Rule of Evidence 407. *Tuer* appears to be the first case presented since the Rule was adopted. In that case, a patient was scheduled to undergo coronary bypass surgery. The operation was delayed four hours to allow the surgeon to deal with an emergency involving another patient whose condition was more critical than Mr. Tuer's. The surgeon decided not to restart the Heparin prescribed for Tuer, which had been discontinued at 5:30 a.m. to allow the drug to metabolize prior to the surgery. At 1:00 p.m., Tuer went into cardiac arrest and, despite a seven-hour surgical procedure, he died the following day.

---

the law requires of them. To allow evidence that they took such steps to be admissible against them may discourage their doing so.

(3) To the extent that evidence of subsequent remedial measures is not probative of fault—and to the extent that the evidence may suggest that the defendant believes that it had earlier not met the standard of due care—there is also the likelihood of *confusion of the jury and unfair prejudice.*

McLain, at 110.

As a result of the patient's death, the hospital changed the policy of discontinuing Heparin four hours before patients suffering from angina underwent surgery. Thereafter, Mrs. Mary Tuer filed suit against the two surgeons who performed the operation.

In an attempt to inform the jury of the change in policy concerning the use of Heparin, the plaintiff asked one of the cardiac surgeons if it was "feasible" to restart the Heparin. The court sustained an objection to the question.[3] Counsel then inquired if the surgeon thought it would have been *unsafe* to restart the Heparin and the response was "yes." Counsel then sought to *impeach* the surgeon by showing that restarting Heparin was not unsafe. The trial court rejected the argument.

The Court of Appeals addressed both the "feasibility" and the "impeachment" issues raised by the plaintiff in *Tuer*. The latter is not relevant to the case *sub judice*, although the decision of the trial court rejecting the plaintiff's impeachment argument was sustained. On the "feasibility" argument, the Court of Appeals noted that the exception in Rule 5–407(b) allowing subsequent conduct has been troublesome in negligence cases. The Court reiterated that the surgeons and their expert witnesses did not suggest that restarting the Heparin was not feasible. They indicated that it would have been resumed if the patient exhibited signs of renewed angina. The existing protocol that was followed was a professional judgment call. Thus, restarting the Heparin was held to be feasible but not advisable.

■ Rule 5–407(b) does not require the exclusion of evidence of subsequent measures when offered to prove "feasibility of precautionary measures, if controverted." Pellucidly, in

---

**3.** During a discussion of defendant's motion *in limine* to exclude evidence of a change in practice plaintiff argued that the evidence would be admissible to show that restarting Heparin was "feasible." The court said it would allow the evidence for that purpose if the defendants denied the feasibility of restarting the Heparin.

*Tuer,* feasibility was not controverted and, therefore, there was no reason to allow the evidence of a change in protocol.

In the case before us, the appellee claims that the subsequent measures taken by DNR were admissible under the "feasibility" exception in 5–407(b). Appellee called the track manager, Walls, as an adverse witness and asked the following questions:

Q. [Y]ou testified in your deposition that you had this inside rail down because your men were moving mowers on the inside of this track. Is that correct?

A. That's correct.

Q. And leaving it down saved time. Correct?

A. That's partly correct.

Q. You could have just as easily, because it's not difficult to put the rail back up when the men were finished mowing, they could have put it down, came out, and put it back up again. That could have been done just as easily. Correct?

A. It's not as easy as leaving it open, but it was a common practice to leave it open.

Q. But the question is you could have done it the way I just described?

A. Could have, yes.

Q. Do you think it was safe to leave that inside rail down when the horses are breezing?

A. Yes, it is.... If the horses are traveling to the right of the cones as they should be doing, as they know that they should be doing, it would be no problem whatsoever.

Q. Wouldn't it have been safer to put that rail back up while the horses were breezing?

A. As I have already answered, sir, it would not be any safer had the horses been where they were supposed to be.

Appellee then argued to the court that evidence that the maintenance workers began replacing the rail each time they cut the grass was admissible. His authority was that Walls's testimony that it would not be any safer to close the rail was a denial that replacing the rail was feasible and, therefore, fit

the exception set forth in sec. (b) of the Rule. Over objection, the court agreed. That ruling led to the following exchange:

Q. Mr. Walls, I just asked you, just to refresh everyone's recollection, wouldn't it have been safer to put the rail back up while horses were running, and your answer was, "No." You were present during Mr. Favinger's deposition, were you not?

A. Yes, I was.

Q. And do you recall me asking Mr. Favinger as a result of this incident with [Lifespecialady] was anything changed or any procedures changed or anything at all involving the removal of this inside rail to create this gap, was the policy or anything at all changed about how often or how long this rail could be left open in the future? Do you remember his answer?

A. Yes, I do.

Q. He said, yes, it was changed that we would make sure that all the gaps are closed at all times. Did you issue that edict to Mr. Favinger that it was to be closed at all times after this happened?

A. As I said to you before during the deposition, I told you I did not recall that, but I don't deny that I told him that because he said that I did.

Before us, the appellee contends that the appellant "opened the door" to the admissibility of the subsequent remedial evidence because Walls contested the feasibility of replacing the rail each time the workers entered the infield. We disagree.

Initially, we point out that the only hand on the "opened door" belonged to appellee, who called Walls as a witness, and asked if he could have replaced the rail each time it was removed. Walls answered, "Could have, yes." Irrefutably, that response did not question the feasibility of replacing the rail each time it was open. It admitted feasibility and questioned only the necessity or advisability of taking that action. We hold that feasibility was not being controverted as required by the statute, and the exception did not apply.

Appellant advanced a reasonable basis for leaving the one section of rail open. Walls said safety was not a factor because the horses were to run outside the cones, because he had a shortage of manpower to replace the rail regularly and the custom of leaving the rail open had not been a problem for track users. These factors guided his decision not to require closing the rail regularly. All of these factors relate to a judgment call, not to feasibility. The holding in *Tuer* is dispositive of this case.

Appellees were clearly attempting to use the remedial measures as substantive evidence, which is the reason for the Rule. In closing argument, appellee told the jury, "If this [the open rail] was as safe as the State says to have this rail down, then why after this happened to Lifespecialady did they change their policy afterwards." The trial court erred as a matter of law in allowing the argument that may well have been devastating to appellant and was objected to by the State. Accordingly, we reverse and remand for a new trial.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR CECIL COUNTY FOR NEW TRIAL.**

**COSTS TO BE PAID BY APPELLEE.**